**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**CHICAGO TITLE INSURANCE COMPANY,**

**Plaintiff,**

**v.**

**REMAJ, LLC,**

**Defendant.**

**Case No. 2:25-cv-1199**

**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Vascura**

## OPINION AND ORDER

REMAJ, LLC, fell for an elaborate scam to buy land that was never for sale, from a person who didn't own it. In hindsight, multiple persons involved could have (and perhaps even should have) spotted the red flags and uncovered the purported seller's scheme before REMAJ's escrow agent wired over $1 million to the fraudster's bank in Vietnam. But the only question here is whether Chicago Title Insurance Company plausibly bears any liability for the transaction under the theories set forth in any of REMAJ's counterclaims. At least as currently pleaded, the answer is no.

This suit started when Chicago Title filed for a declaratory judgment regarding its obligations to REMAJ regarding that real estate transaction. More relevant to this Opinion and Order though was REMAJ's response to that lawsuit. In addition to answering, REMAJ asserts six counterclaims against Chicago Title: (1) professional negligence, (2) negligence, (3) breach of fiduciary duties, (4) breach of the escrow agreement, (5) breach of the ALTA commitment, and (6) a declaratory judgment action regarding Chicago Title's obligation to issue a title policy to REMAJ relative

to the land sale. (Doc. 8, #182–92). REMAJ pleads counterclaims four, five, and six in the alternative to the first three counterclaims. (*Id.*). Chicago Title has now moved to dismiss those counterclaims on various grounds. (Doc. 18). As described below, the Court **GRANTS** that motion and therefore **DISMISSES** all six counterclaims, but does so **WITHOUT PREJUDICE**.

## BACKGROUND

### A. The Fraudulent Land Sale.

In May 2025, Kenny Sims and Scott Sims, owners of REMAJ, LLC, wanted to buy some land. (Answer, Doc. 8, #176). To that end, they saw a real estate listing from realtor Linda Clagg, which indicated that Vylee Greaves was selling an 86-acre plot in Franklin County. (*Id.*). Potentially interested, the Sims asked their realtor, Doug Tenenbaum, to reach out to Clagg. Shortly thereafter, on May 19, REMAJ entered into a real estate contract to buy that land for $1,159,137. (*Id.*; Compl., Doc. 1, #3).

Unfortunately, things were not as they appeared. (Doc. 8, #176). Rather, the Sims fell victim to an elaborate scheme generally referred to as "Seller Impersonation Fraud" (SIF). (*Id.*). In short, the person who claimed to be the owner, Vylee Greaves,[1] who communicated with the Sims and the realtors, and who provided signatures and other documents, was instead an imposter. (*Id.*). But by the time the jig was up, it was too late—the Sims had sent, through the title agent for the deal (Apex Title

[1] Vylee Greaves is the record owner of the land at issue, (Doc. 18, #324), but there is no indication that she had any involvement with the fraudulent land sale. The real Vylee Greaves is "an approximately 78 year old woman that lives in Encinitas, CA with her husband, Thomas Greaves." (Doc 8, #177).

Agency), more than a million dollars to the fraudsters. To date, REMAJ has not recovered any of those funds. (*Id.* at 181).

As buyers typically do when purchasing real property, REMAJ had sought to acquire title insurance in conjunction with the sale. According to REMAJ, the purported seller selected Apex Title Agency (Apex) as the title insurance agent. (Doc. 8, #177). On May 15, 2025, four days before REMAJ executed the contract to buy the property, Apex issued an American Land Title Association (ALTA) Commitment for Title Insurance to REMAJ on Chicago Title's behalf. (*Id.*; Doc. 1, #3; Doc. 8-6, #221 (ALTA Commitment)). The Commitment, which is described in further detail below, laid out Chicago Title's obligation to issue a title insurance policy to REMAJ with respect to Greaves's land, an obligation that arose only if specific conditions were met. (*See id.*; *infra* Part B).

Over the ensuing two months, Tennenbaum, Clagg, and Scott Briley, Apex's owner, communicated with the purported seller and the Sims about the upcoming closing, though without ever meeting the seller in person. (Doc. 8, #177–80). In retrospect, it's unsurprising that the realtors and Briley had trouble obtaining certain information and documents from the purported seller,[2] who claimed to be in Vietnam during the relevant period. (*Id.*). The purported seller, though, did raise one wrinkle.

[2] On May 29, Briley requested that the purported seller send a copy of her driver's license and passport, but the seller never responded to his request, and it doesn't appear that Briley followed up. (*Id.* at #178, 180; Doc. 8-7, #232). This is the only instance in the record where a person attempted to verify the purported seller's identity. On May 22, Briley asked for the name of the purported seller's spouse for the deed, to which the seller responded "Sassy Greaves." (Doc. 8, #178; Doc. 8-7, #233; *see also* Doc. 8-8 (general warranty deed signed as "Santiago Sassy Greaves")). The spouse of the real Vylee Greaves is named Thomas Greaves. (Doc. 8, #178).

According to the seller, a "Carl Martinez" was farming the land under an agricultural lease. To account for that, Chicago Title's Commitment required the seller to execute and record a quit-claim deed and other documents to quiet Martinez's alleged interests in the real property before the title insurance policy would issue. (Doc. 8-6, #224). But the purported seller did not provide those documents (and others) in time for the June 4 closing date the purchase agreement specified. So the parties pushed closing to June 17. (Doc. 8, #178; Doc. 8-4, #210 (real estate purchase contract)). After some additional delays, the purported seller mailed the necessary documents from Vietnam via DHL. (Doc. 8, #179). These documents included a general warranty deed purporting to transfer the land to REMAJ. According to the seller, the "U.S. Embassy" in Vietnam had notarized it. (*Id.*; Doc. 8-8 (deed)). With documents now in hand, the parties selected a closing date of July 2, 2025. (Doc. 8, #179).

Consistent with that plan, on July 2 the seller requested a wire transfer confirmation for the purchase payment. Briley (Apex's owner) wrote that "WE cannot fund until we are able to record the Deed with an Approved legal description." (Doc. 8-7, #268 (Email from Briley to Vylee Greaves and others)). He said he would "let [the seller] know as soon as the county sends approval." (*Id.*). Later that day, Briley again emailed the purported seller, along with Tenenbaum, Clagg, and the Sims. There he wrote that "[w]e just received the Approval from the County Engineer on the legal description," and he informed the seller that he would wire the payment the next day. (*Id.*). At that point, though, the deed had *not* in fact been recorded (although it seems that Briley thought it was). In any event, true to his word, Briley wired $1,078,771.86

to the purported seller's bank account in Vietnam the next day, July 3. (Doc. 1, #5; Doc. 8, #181; Doc. 8-7, #270).

Sometime after that wire transfer, the parties learned that the Franklin County Recorder had declined to record the deed because it was a forgery. (Doc 1, #5–6; Doc. 8, #181; Doc. 8-8). Nonetheless (or perhaps it would more accurate to say—spurred by that fact), REMAJ demanded Chicago Title issue the title insurance policy to REMAJ specified in the Title Commitment, and so it "ostensibly seeks coverage under" that policy. (Doc. 1, #6).

## B. The ALTA Title Insurance Commitment.

Because the parties' dispute centers on their divergent interpretations of the ALTA Commitment, the Court describes relevant excerpts below to aid its later discussion.

### 1. Notice

The Commitment's first page contains a notice that states:

> IMPORTANT—READ CAREFULLY: THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.
>
> ***
>
> THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED … IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT.

(Doc. 8-6, #217).

### 2. Commitment to Issue Policy

Following the notice is a section titled "COMMITMENT TO ISSUE POLICY," which reads:

> Subject to the Notice; Schedule B, Part I—Requirements; Schedule B, Part II—Exceptions; and the Commitment Conditions, Chicago Title Insurance Company, an Ohio Corporation[3] (the 'Company'), commits to Issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Amount of Insurance and the name of the Proposed Insured. If all of the Schedule B, Part I—Requirements have not been met within 90 Days after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

(*Id.*).

### 3. Conditions

The next section lists the "COMMITMENT CONDITIONS," and states that Chicago Title "is not obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of [Chicago Title]." (*Id.* at #219).

The Commitment also declares that "[a]ny claim must be based in contract under the State law of the State where the Land is located and is restricted to the terms and provisions of this Commitment." However, it notes that "[w]hen the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy." (*Id.*).

---

[3] The ALTA Commitment erroneously states that Chicago Title is an Ohio corporation. (Doc. 1, #3 n.1; *see, e.g.*, Doc. 8-6, #217). Chicago Title's complaint attaches a certificate of incorporation confirming that it is a Florida corporation. (Doc. 1-2, #9).

Also recall that, here, Chicago Title did not issue the Commitment directly. Rather, Apex, acting as agent for Chicago Title, did so. The Commitment explicitly addresses the ramifications of that arrangement as well. In a section that begins "IF THIS COMMITMENT IS ISSUED BY AN ISSUING AGENT," the Commitment states that an issuing agent (here Apex) "is [Chicago Title]'s agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the [Chicago Title]'s agent for closing, settlement, escrow, or any other purpose." (*Id.*). That is, the Commitment states that Apex serves only as Chicago Title's limited-purpose agent, not as its general agent.

**4. Schedule A**

As noted above, the Commitment includes a Schedule A which provides various details relating to the proposed real estate transaction. Apex completed the Schedule A here to name REMAJ, LLC as the proposed insured for land in fee simple, and the schedule further specifies a proposed insurance amount of $1,159,137. It then goes on to list the effective date for the commitment as May 15, 2025. (*Id.* at #221). It describes the title as "vested in Vylee F. Greaves by virtue of an Amended Certificate of Transfer, filed January 12, 1999 in the Franklin County Probate Court, and Recorded on January 12, 1999 … [in] the Franklin County Records," and attaches an exhibit detailing the property's boundaries. (*Id.* at #221–223).

**5. Schedule B**

Schedule B, Part I lists conditions that must be met before Chicago Title will issue the title insurance policy. Particularly relevant here, the fourth condition states

that documents "satisfactory to [Chicago Title] that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records." (*Id.* at #224). The Commitment also defines "Public Records" as:

> The recording or filing system established under State statutes in effect at the Commitment Date under which a document must be recorded or filed to impart constructive notice of matters relating to the Title to a purchaser for value without Knowledge. The term "Public Records" does not include any other recording or filing system, including any pertaining to environmental remediation or protection, planning, permitting, zoning, licensing, building, health, public safety, or national security matters.

(*Id.* at #218).

### C. The Lawsuit.

Chicago Title, not REMAJ, initiated this suit under the Court's diversity jurisdiction. (Doc. 1, #2). Perhaps foreseeing that REMAJ might try to mitigate its losses in the underlying real estate transaction through legal action against those involved, Chicago Title sought a judicial declaration stating that (1) Chicago Title is not obligated to issue a title insurance policy to REMAJ, and (2) Chicago Title has no obligation to REMAJ relative to the real property. (Doc. 1, #6).

REMAJ answered and asserted six counterclaims against Chicago Title alleging negligence, breach of fiduciary duty, and breach of contract under Ohio law. (Doc. 8, #182–92). Chicago Title moved to dismiss all six counterclaims under Rule 12(b)(6) for failure to state a claim. (Doc. 18). REMAJ responded, (Doc. 21), and Chicago Title replied, (Doc. 27). So the matter is ripe for this Court's review.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "[counterclaim] must present sufficient facts to 'state a claim to relief that is plausible on its face.'" *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the [proponent] pleads factual content that allows the court to draw the reasonable inference that the [party against whom the claim is directed] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing plausibility, the Court "construe[s] the [claim] in the light most favorable to the [proponent]." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (cleaned up).

A court analyzing a motion to dismiss under Rule 12(b)(6) generally must confine its review to the pleadings. *Armengau v. Cline*, 7 F. App'x 336, 343 (6th Cir. 2001). In the context here, that would generally limit a court to considering the counterclaim and any documents attached to it. *Id.* But sometimes a court may properly consider other things. For example, a court may consider documents that the counterclaim-respondent attaches to its motion, though only to the extent that those documents are referenced in the counterclaims. *Id.* at 344. Or if the pleadings refer to a written instrument that is integral to the claims, the court may consider it without converting a motion to dismiss into one for summary judgment. *Com. Money Ctr., Inc. v. Ill. Union Ins.*, 508 F.3d 327, 335–36 (6th Cir. 2007); Fed. R. Civ. P. 10(c). "These written instruments are records falling within a narrowly defined class of legally significant documents on which a party's action or defense is based. As a

result, they often create or define legal rights or obligations, or define or reflect a change in legal relationships." *Anderson v. ABF Freight Sys., Inc.*, No. 1:23-cv-278, 2024 WL 51255, at *9 (S.D. Ohio Jan. 4, 2024) (cleaned up). Finally, a court can consider public records or decisions of public agencies. *J.P. Silverton Indus. L.P. v. Sohm*, 243 F. App'x 82, 86–87 (6th Cir. 2007).

## LAW AND ANALYSIS

Chicago Title moves to dismiss all six of REMAJ's counterclaims, three of which sound in tort and three of which sound in contract. It essentially argues that the Commitment's existence bars the tort claims and its terms preclude the contract claims. (Doc. 18). Ultimately, the Court agrees. After starting by assuring itself that it has jurisdiction, the Court takes each of the six counterclaims in turn.

### A. The Court Has Diversity Jurisdiction Over This Matter.

The Court starts, as it must, with jurisdiction. This case proceeds under the Court's diversity jurisdiction, which has both a diversity requirement and an amount-in-controversy requirement. The latter is easily met. To proceed in diversity, the amount in controversy must exceed $75,000. 28 U.S.C. § 1332(a). Here, REMAJ alleges it has suffered significant financial losses (in excess of $1 million). (Doc. 8, #192). And if Chicago Title must issue a title insurance policy, the company would presumably be on the hook for that amount. So its request for a declaration that it has no such obligation meets the amount in controversy requirement. *See Northup Props., Inc. v. Chesapeake Appalachia, LLC*, 567 F.3d 767, 770 (6th Cir. 2009) (holding that, in a declaratory judgment action, the amount in controversy is

determined by reference to the value of the declaratory relief the plaintiff seeks) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)).

Next consider the diversity requirement. Section 1332 requires complete diversity, meaning there can be no overlaps in citizenship on opposing sides of the v. So what are the relevant citizenships here? Chicago Title is a corporation, meaning it has citizenship in both its state of incorporation and its principal place of business. 28 U.S.C. § 1332(c)(1). Name notwithstanding, the pleadings state that Chicago Title is a Florida corporation, (Doc 1, #2; *see also* Doc. 1-2 (attaching Florida articles of incorporation)), and it appears that its principal place of business is in Jacksonville, Florida. (Doc. 1-2, #12 (listing Jacksonville as its principal office)). So it is a citizen of Florida.

REMAJ, on the other hand, is a limited liability company (LLC). The complaint alleges that it is registered in Ohio. (Doc. 1, #2). But that is irrelevant. LLCs "have the citizenship of each partner or member." *V&M Star, LP v. Centimark Corp.*, 596 F.3d 354, 356 (6th Cir. 2010) (quoting *Delay v. Rosenthal Collins Group*, LLC, 585 F.3d 1003, 1005 (6th Cir. 2009)). So the key question for diversity jurisdiction purposes is whether any of REMAJ's members are citizens of Florida. REMAJ's citizenship disclosure statement answers that question. It says that the LLC is comprised of four individual members: three citizens of Ohio and one citizen of Illinois. (Doc. 15, #313–14). Thus, jurisdiction is proper under 28 U.S.C. § 1332.

### B. REMAJ's Tort Law Counterclaims Fail.

With jurisdiction out of the way, turn to the counterclaims themselves, starting with the tort law counterclaims—negligence, professional negligence, and breach of fiduciary duties. (Doc. #8, #182–90). As to each, REMAJ must plausibly allege duty, breach, and causation. It fails as to the first, though, so the Court need not consider the others.

At bottom, REMAJ claims that Chicago Title had a duty to warn it of the possibility of seller impersonation fraud and to take steps to ensure that REMAJ did not engage in a fraudulent transaction. But where would such a duty lie? The Court sees only two possibilities, and neither one works.

First, perhaps it arises from the Title Commitment itself. That is, maybe REMAJ is claiming that the Commitment imposes duties on Chicago Title, and that Chicago Title has breached them. In fact, Ohio courts interpret title insurance commitments as contracts between title insurers and their proposed insured. *See, e.g.*, *Domoney Corp. v. Uslife Title Ins. Co.*, No. 85AP-318, 1985 WL 10495, at *4 (Ohio 10th Dist. Nov. 5, 1985) (finding no error in denying title insurance policy coverage "on the contractual basis of the commitment for title insurance" because commitment's conditions were not satisfied); *Gayheart v. Midland Title Sec.*, 2004-Ohio-2536, ¶ 22 (5th Dist.) (same).

REMAJ does not dispute that it engaged Apex Title Agency with the purpose of obtaining a title insurance policy, and that Chicago Title issued its commitment to issue a title insurance policy as part of those dealings. (*See* Doc. 8, #177). The Commitment states that its terms became "effective as of the Commitment

Date … when [Chicago Title] has entered in Schedule A both the specified dollar amount as the Proposed Amount of Insurance and the name of the Proposed Insured." (Doc. 8-6, #217). Schedule A of the Commitment lists a proposed insurance amount of $1,159,137 and names REMAJ, LLC as the proposed insured, with the result being that the Commitment took effect on the specified date, May 15, 2025. In short, the Commitment is a voluntary undertaking that imposes enforceable obligations on Chicago Title—that sounds a lot like a contract.

Admittedly, as a matter of first principles, one could quibble with that a bit. After all, the Title Commitment lacks mutuality—it imposes no obligations on REMAJ, nor does it appear that REMAJ paid Chicago Title in exchange for the Commitment. So it is likely not a full-blown contract, not even an option contract (as REMAJ did not pay any consideration for Chicago Title to keep the offer open). Nonetheless, to the extent that the piece of paper imposes obligations on Chicago Title at all, those obligations necessarily sound in contract.

But with that understanding, two problems arise. First, "under Ohio law, 'the existence of a contract action excludes the opportunity to present the same case as a tort claim." *Acad. Imaging, LLC v. Soterion Corp.*, 352 F. Appx. 59, 64 (6th Cir. 2009) (citation modified) (quoting *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270 (1996)). Second, if the Commitment is an enforceable contract, its language requires that same result. The Commitment's own terms explicitly restrict claims against Chicago Title to those arising in contract law. (Doc. 8-6, #217 ("All claims or remedies … involving the content of this Commitment … must be based

solely in contract"); *id.* at #219 (claim "must be based in contract under [Ohio law] and is restricted to the terms and provisions of this Commitment")). In short, REMAJ cannot rely on any of the obligations set forth in the Commitment as the basis for a duty to support its tort claims.

In fairness to REMAJ, though, in many ways it does not seem to be relying on the Commitment's obligations as the basis for its tort claims. That is, none of the three counterclaims point to any provision in the Commitment that REMAJ says Chicago Title breached. Rather, REMAJ simply posits that Chicago Title owed it "the duty of reasonable care in verifying a seller's identity; following procedures to identify SIF and wire fraud; identifying SIF and wire fraud; warning REMAJ of SIF and wire fraud; and attempting to recover REMAJ's funds." (Doc. 8, #188). So perhaps REMAJ is relying on duties *apart from* the Commitment. After all, if two parties contract for yard care services, and one party later drives negligently and harms the other, the negligent driver cannot point to the contract as a basis for escaping liability. In other words, duties can arise from sources apart from any contract (or contract-like arrangement) the parties may have entered.

But that approach does not work for REMAJ here either. To start, while courts are generally required to treat the allegations in a complaint (or, more accurately here, a counterclaim) as true, that does not extend to legal conclusions. *See Iqbal*, 556 U.S. at 678. And the existence of duty is a question of law. *See, e.g.*, *Indiana Ins. Co. v. Midwest Maintenance, Inc.*, 174 F. Supp. 2d 678, 680 (S.D. Ohio 2001) (citing *Mussivand v. David*, 544 N.E.2d 265, 269 (Ohio 1989)). So it is not enough for REMAJ

to *allege* that such duties exist. Rather, in response to a motion to dismiss, REMAJ must show that to be so. Yet REMAJ cannot (or at least does not) point to a single case suggesting that a party that acts solely as a putative title insurer in connection with a proposed real estate transaction has a duty, fiduciary or otherwise, to warn its prospective title insurance customers of the dangers inherent in that transaction. Nor is the Court aware of any basis under Ohio law to impose such a duty. Indeed, to the extent that case law speaks to the issue at all, it points the other direction. As another Ohio federal court observed, "Ohio has not recognized a general fiduciary duty between a title insurance company and a borrower." *Davis v. Lawyers Title Ins. Corp.*, No. 1:06 cv 357, 2007 WL 782158, at *3 (N.D. Ohio Mar. 13, 2007). True, REMAJ makes much of the fact that the court there referred to the title insurance company's customers as "borrowers," and it notes that here it paid in cash. (Doc. 21, #355). But that is a distinction without a difference in deciding whether the title insurance company has a duty. The Court can conceive of no reason why a title insurance company would owe a duty if the customer is borrowing to purchase the property, but not if the customer is paying cash.

Separately, REMAJ's allegations go on at some length in explaining that Chicago Title had greater knowledge about the possibility of seller impersonation fraud. But that doesn't help REMAJ much either. "Superior knowledge," in and of itself, is "insufficient … to establish a special relationship of trust." *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 521–22 (6th Cir. 1999).

Nor does REMAJ fare any better with its efforts to impose tort liability on Chicago Title based on conduct by Apex and Briley. Throughout its allegations, REMAJ treats Chicago Title, Apex, and Briley as a unit. It says that this is because the latter two are agents for Chicago Title, rendering Chicago Title liable for their conduct under traditional principles of agency law. But under Ohio law, courts "may determine the … scope of an agency relationship as a matter of law if the relationship is so clear as to be undisputed." *Fifth Third Mortg. Co. v. Chicago Title Ins. Co.*, 758 F. Supp. 2d 476, 483 (S.D. Ohio 2010), *aff'd*, 692 F.3d 507 (6th Cir. 2012). The facts on the record clearly establish that Apex's (and Briley's) agency relationship with Chicago Title was limited in scope. The Title Commitment itself explicitly disclaims any agency relationship between Apex and Chicago Title other than "for the limited purpose of issuing title insurance commitments and policies." (Doc. 8-6, #219). So, to the extent that Apex or Briley took on a broader role (e.g., handling or sending REMAJ's money), that conduct would not have fallen within the scope of the agency thus defined. And REMAJ has not pleaded any facts suggesting a broader agency relationship.

In sum, REMAJ cannot sue in tort based on alleged contractual obligations, and it has failed to identify any free-standing duty, apart from such contractual obligations, here. Accordingly, the Court dismisses counterclaims one, two, and three.

### C. The Court Finds That REMAJ Fails to State Its Contract Law and Declaratory Judgment Counterclaims.

Nor do REMAJ's contract law counterclaims or request for declaratory judgment pass muster. The Court discusses each in turn below.

### 1. Breach of Implied Escrow Agreement

A contract cannot be breached if it never existed. REMAJ's fourth counterclaim fails because neither the Commitment nor the parties' dealings imply an escrow agreement between REMAJ and Chicago Title. The record shows that Scott Briley, not Chicago Title, provided escrow services on Apex's behalf—acts that included, most notably, transferring funds to the purported seller. (*See generally*, Doc. 8-7 (emails between Briley's Apex email account and the purported seller)). And the Commitment's terms expressly disclaim an escrow-via-agency relationship regarding Chicago Title.[4]

REMAJ's arguments to the contrary are closer to "naked assertions" than they are to facts sufficient to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 663, 678. REMAJ baldly asserts that it had "an implied contract for escrow services" with Chicago Title and Apex, and that, under the implied escrow agreement, "[Chicago Title], Apex and Briley contracted to accept and disburse funds according to the parties' settlement statement and purchase agreement in accordance with industry standards." (Doc. 8, #190). But bald assertions are not facts, and the Commitment's agency disclaimer and the lack of evidence supporting the existence of such an implied agreement for escrow services point strongly the other way. (Doc. 18, #337).

---

[4] Under "IF THIS COMMITMENT IS ISSUED BY AN ISSUING AGENT," the Commitment states that an issuing agent "is the [Chicago Title]'s agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the [Chicago Title]'s agent for closing, settlement, escrow, or any other purpose." (Doc. 8-6, #219).

As support for its implied-agreement theory, REMAJ alleges that "REMAJ agreed to pay Plaintiff, Apex and Briley $295 for its escrow services." (Doc. 8, #190). But REMAJ's own exhibits contradict that a $295 payment was made to Chicago Title for the purpose of providing escrow services. (*See* Doc. 8-9, #277). There is only one mention of a $295 payment in the record—a line item in the Settlement Statement listed as "Settlement or closing fee." But that fee was paid to *Apex*, not Chicago Title. (*Id.*; *see also* Doc. 18, #337).

Having found that there are insufficient facts on the record to plausibly imply an escrow agreement between the parties, the Court grants Chicago Title's motion to dismiss REMAJ's fourth counterclaim.

**2. Breach of the Commitment**

REMAJ's fifth counterclaim alleges that Chicago Title's refusal to issue a title insurance policy or provide insurance coverage breaches its contractual obligations under the Commitment. (Doc. 8, #191–92). But according to the Commitment's terms, Chicago Title's obligation to issue the policy was contingent on the deed's proper recording in the Franklin County Recorder, which the parties agree never occurred. (Doc 1, #5–6; Doc. 8, #181; Doc. 8-8). Thus, the Court finds that REMAJ has failed to plausibly allege a breach.

The Commitment states that Chicago Title "is not obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of [Chicago Title]." (Doc. 8-6, #219). And Schedule B, Part I states that "[d]ocuments satisfactory to [Chicago Title] that convey the Title

or create the Mortgage to be insured, or both, *must be properly authorized, executed, delivered, and recorded in the Public Records.*" (*Id.* at #224) (emphasis added). "Public Records" are defined as:

> The recording or filing system established under State statutes in effect at the Commitment Date under which a document must be recorded or filed to impart constructive notice of matters relating to the Title to a purchaser for value without Knowledge. The term "Public Records" does not include any other recording or filing system, including any pertaining to environmental remediation or protection, planning, permitting, zoning, licensing, building, health, public safety, or national security matters.

(*Id.* at #218).

In sum, the Commitment made Chicago Title's duty to issue a title insurance policy conditional on the Franklin County Recorder having recorded documents conveying title to the land. Because the duty was conditional, Chicago Title was entitled to demand strict compliance with the condition as a precursor to any duty arising. *See* Willison on Contracts, § 44:53 ("[S]ubstantial performance is ordinarily not applicable to excuse the nonoccurrence of an express condition precedent to a contract."). Indeed, as the condition here clearly constitutes "a material part of the agreed exchange," that is so even if reliance on that condition would cause a "disproportionate forfeiture" to REMAJ. *See* Restatement (Second) of Contracts § 229 (A.L.I. 1981). Against a backdrop where compliance with the condition was necessary, the allegations show that Apex *attempted* to record the purported seller's general warranty deed (a document that purported to convey title to Greaves's land) by submitting it to the Franklin County Recorder. (*See* Doc 1, #5–6; Doc. 8, #181; Doc. 8-8). But that office refused to the accept the deed, concluding it was a forgery, meaning

that the document was never "properly" recorded in the records office. (*Id.*). Because REMAJ has not plausibly alleged that the condition occurred, that in turn means that it has not plausibly alleged that Chicago Title breached its commitment by declining to issue a policy or provide coverage. So the Court dismisses REMAJ's fifth counterclaim.

**3. Request for Declaratory Judgment**

REMAJ's sixth counterclaim—a request for declaratory judgment—asks the Court to issue a declaration that Chicago Title "is obligated to issue a Title Policy to REMAJ relative to the real property and is obligated to insure REMAJ relative to the transaction and/or failure of title being conveyed to REMAJ."[5] (Doc. 8, #192). As discussed above, supra Part C.2, Chicago Title's promise to issue the policy and provide coverage was conditional on the proper recording of the deed. REMAJ has not plausibly alleged that condition occurred. Additionally, this claim essentially duplicates REMAJ's already mature contract claim, so declaratory relief would be inappropriate in any event. *See Moser v. Menard, Inc.*, No. 1:20-cv-796, 2023 WL 5979263, at *3 (S.D. Ohio Sep. 13, 2023). Therefore, the Court dismisses REMAJ's sixth counterclaim.

---

[5] As Chicago Title notes, REMAJ's last two counterclaims are mirror images of Chicago Title's requested declaratory relief. (Doc. 1, #6; *see also* Doc. 18, #324 n.1). But the Court emphasizes that this Opinion and Order only addresses Chicago Title's motion to dismiss REMAJ's counterclaims at this time.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Chicago Title Insurance Company's (Chicago Title) motion to dismiss each of REMAJ, LLC's counterclaims (Doc. 18), and therefore **DISMISSES** the counterclaims **WITHOUT PREJUDICE**.

**SO ORDERED.**

October 13, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**